May it please the Court, my name is Jay Keha. I represent Mr. Bojorquez-Rojo, whom I'll refer to as Mr. Rojo for the context of the remainder of the argument. Also on the brief is C. Tom Arkush, who is not present, and Greg Silvey, who has joined, essentially, us for oral argument, who represents Mr. Vasquez, Mr. Vasquez. Four issues presented here, and essentially, really, one controlling substantive issue, which is essentially whether the District Court erred in concluding that Searching Officer Corporal Rivera had a reasonable belief that, in fact, there was an implied consent to search the subject residence based on the presence of a landlady at the residence. The other two issues are whether the landlady had common authority over the premises. And our third issue, which was essentially the motion to suppress, was whether Rojo and Vasquez enjoyed a right to privacy at the subject residence. And lastly is our motion to strike. As I stated, the first issue is essentially dispositive over this matter. If, in fact, the Court rules today that the District Court did commit that error, we're probably looking at a remand or something along those lines. I'm not going to be, the facts are quite lengthy, and in the time presented, I really don't have time to go into those, but I'm sure the Court will have some questions. Well, we, yeah, we're pretty familiar with the facts. I'm just having trouble understanding why, if the police show up and you've got somebody there who says she's the landlady, and, in fact, she was going to be showing the house to somebody, why police wouldn't have a reasonable belief, based on her statements, that they had authority to go into the house? Well, the problem, Your Honor, in this case... Does she have to show a title to the house or something? Well, I think in this instance, it's not necessarily that her presence, it's not necessarily that she has to produce a title or some indicia of ownership to the house. It's the fact that when she shows up at the house, there are two things. There's, A, a lease that requires that the tenant give some type of notice before the tenant leaves, and, B, there are two individuals who appear to be subletting the residence and have a perfectly reasonable story as to why they're there. Now, in this instance, I would posit, and we would posit, in fact, that Officer did not make any reasonable inquiry into whether he could search the residence based on the presence of Mr. Rojo and Mr. Vazquez-Vazquez. And this would be an extension, I think, of the holding in Illinois v. Rodriguez, where it states that even an invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances can conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. In this instance, Officer Rivera, Corporal Rivera, arrived at the subject residence. He met Mr. Vazquez and Mr. Rojo, who had a garage door opener to get into the residence, and there was a phone call that preceded this series of events with an Amber Evans, who, in fact, made a representation that there was an arrangement and there are two sort of stories floating around as to how this happened, but there the garage and maybe the residence at some point. After all of this occurred, Corporal Rivera made no attempt to stop and inquire further into the matter, but simply walked into the residence, and that's where we would assert that the error was made. The government has essentially represented in this matter that, well, he was just investigating by, in fact, completing the search, but that doesn't appear to be the case. He entered the residence He noted items of packing material, which, through his training and experience, we are to assume gave some indication that some type of illicit drug activity was occurring, which caused the search of the car and essentially led down that path to discovery of the methamphetamines and the cocaine in the residence. So that's essentially our representation, that he simply searched without any further inquiry, and that's where the error was made. So maybe I'm missing something here, but this analysis may be too simplistic, but why doesn't he have apparent authority to enter based on the landlady saying she doesn't know who these guys are and basically, at least impliedly saying, go ahead and search. It's my property. Well, first, Your Honor, the landlady, there's no testimony, and I would refer you to page 147 of our excerpts. She didn't expressly say, go ahead and search. Correct. Correct. She never stated that. It's a culmination of facts, I suppose. Like I said, there was the garage door opener that was there. There were friends of the tenant that were there. The tenant, I should mention, hadn't moved out yet. There was this period of two months where she had not been paying on the rent, and she was moving out over a slow period of time. The night beforehand, the landlady was at the residence and discovered a car in the garage that she thought belonged to the tenant's boyfriend, a co-tenant, as it were. There were all of these items that sort of led up to the fact that somebody said Mr. Rojo and Mr. Vasquez Vasquez could be there. There was no imminent danger. There was no reason that Corporal Rivera couldn't have simply detained the parties and obtained a search warrant in this instance. Maybe we should back up. I guess I'm wondering if we even need to get there. The question is whether these individuals are even within the ambit of the Fourth Amendment in terms of an expectation of privacy. You have, you know, this isn't your average bed and breakfast location, and you don't, you know, basically have them dropping in the day before conducting drug activity. And that seems to be just like the Supreme Court case in Minnesota v. Carter where the court said individuals in that status aren't even like an overnight guest situation. And this, and even the, neither the owner nor the tenant here, you know, knew of this activity. So why do they even come within the Fourth Amendment's protection? Well, first I would make the assertion that the district court never made any specific finding of fact as to whether they were there for commercial purposes or for joint commercial and social purposes. I would assert this case is less like Minnesota v. Carter and more like Gaines or Aderno where, in fact, you had a series of drug smugglers that went to a trailer near Arivaca, Arizona. They didn't know the owners of the ranch where this trailer was positioned. They got lost out in the desert. Another drug smuggler essentially intercepted them, brought them to the trailer where they enjoyed what were in dishes of daily living. When Mr. Rojo and Mr. Vasquez were initially located at the residence, Mr. Rojo was asleep inside of the residence. He wasn't there overnight, but they left very, very early in the morning from essentially the safety of the hotel room to stay where they thought they had a place to live. Mr. Vasquez, I believe, was in the driveway or near the driveway when he was located. They had brought overnight bags, clothing, those things along with them. I think it certainly can be asserted they were there for a joint purpose, but I don't think this is simply a case where the individuals were unloading drugs over a two-and-a-half hour period and planned on splitting immediately afterward. They thought they had some interest. That's sort of what our motion to suppress was premised on. There's one more issue that I'd like to address. That is the fact that a note was discovered at the scene. It apologized and did some other things. Sorry, we had to leave. The United States Department of Health and Human Services, I believe, was responsible for the abandonment of the residence or represents that on some level. There's no indication, in fact, that when this note was discovered that the tenant had intended to give this note that day during that period of time over to the landlady. In addition, she still had a car stored at the house as well as small items in the bathroom. There was just no indication that they had left. That's like the privacy issue. The district court didn't go there, correct? Correct. We don't have any findings to rest on one way or the other on that point. That's right. Okay. You might want to save the remaining time for rebuttal. All 14 seconds. Thank you, Your Honor. No, you're down to 12. But I'm going to give you more than 12 seconds because no lawyer can say anything in 12 seconds. Although I would like to challenge you on that point Good morning, Your Honors. My name is Aaron Lukoff. I represent the United States. I'm pleased with this Court. I would start out by talking about the expectation of privacy, which was the last question the Court had for Mr. Keha. I guess I'm wondering whether we could even really consider that if the district court did not and we don't have any findings on it. What is your position on that? Well, the district court did not make a finding on that, Your Honor. The district court decided that the officers had apparent authority from Mrs. Yamamoto. And the facts support that. First of all, the landlady, Mrs. Yamamoto, was there to show the house to the police officer that searched it. So he was there out of his jurisdiction at the house as a potential renter. Was he there himself or was it his wife? The order of appearance is that Mrs. Yamamoto arrived first. She went into the house and discovered both defendants. Then Mrs. Rivera, his wife, showed up. She called police and then called her husband, Reuben, who was on his way just a few blocks away. He then showed up. And by the time he showed up, Mrs. Yamamoto, his wife, and both defendants were outside the house. And that's when he started talking with them. I'd also point out that the officers were acting on more than just the mere presence of Mrs. Yamamoto. Not only was she there, she had been inside the house, she was there to show it to one of the officers, and she was repeatedly telling them that both defendants did not belong there, that they were trespassing, that this was her house, and that she wanted them to leave. So it's more than just her mere presence the officers were acting upon. Not only that, the officers interviewed both defendants and neither defendant gave them a good answer as to why they were there. They even tried to turn the garage door over to the officer and said, just forget it, we just want to leave. At that point in time, that's when Officer Rivera went into the house to see if they had any property there. And that's an excerpt from Record 161. He testified that the reason he went into the house was to see if they had any property there, which they didn't. There was nothing in the house except for packaging material used to wrap drugs. The landlady did have a discussion on the telephone with an Amber Evans, we presume, but the landlady didn't know who Amber Evans was. Amber Evans wasn't the tenant. She had no idea who she was and had never entered into any agreement with Amber. All Amber did was ask her to say that she would pay her some more money in order to rent the house and kind of cover up the problem that had happened. But Amber was not a part to the original lease and the landlady had no idea who she was. The tenant had also abandoned the property and the facts of this case support that conclusion. The tenant had left a note basically supplying her new address. She had left the keys and the garage door opener. Even if she had some sort of intrinsic expectation of privacy still in the residence, for example, she did in fact give the garage door opener to these gentlemen or wanted to come back and clean, it still isn't enough under the Fourth Amendment. The test is reasonableness. And in this situation, the officers, when confronted with the facts of this case, were reasonable in believing that Mrs. Yamamoto had permission to let them into the residence if the residence itself had been abandoned. Mr. Lukoff, the Vasquez and Rojo contend that they had the rights as overnight guests to be at the home. They had permission to be there. Who did they have permission from? Who was their supposed landlord that had given this permission? Well, that's kind of the question that was elusive at the hearing. I gave Andrea Cooper the original tenant use immunity with the expectation that she would testify that she had supplied them the garage door opener in exchange for drugs. But there really isn't anything in the record. She testified that she didn't give them permission, that she told them. We know it wasn't Cooper. It wasn't Cooper, according to her. What about Evans? Did they contend evidence had given them permission to be there? The contention was that it was – I don't even think they named Amber Evans. I know it was Christian, who was later determined to be Christian Casro, had given them permission. But that's part of the problem with their assertion. They couldn't tell who had given them permission. As I've read the record, they failed to identify anybody with any interest in that home who had given them permission to be there. Yes. That's how I read it too, Your Honor. If that's so, I wonder how they could qualify to be an overnight guest because it's a question of whom and they don't identify anybody. I agree. I don't believe they are. It's our position that they're not overnight guests. Or even guests to be in there for a period of time, and the night before apparently they spent their time in a motel when they were sleeping. Correct. Yes. They were at a motel. They came into Nampa, went to the motel, checked in the motel, slept there, met up with Christian Casro and some others. They're casual guests. I don't know. I would contend they weren't even legitimately at the premises. They're casual guests. I suppose casual guests. Did they say there was any communication between them and anybody from before or at the time they got to the motel and the time they got to the house? I'm wondering why they would spend money at a motel if they had the right to stay over here at this house. Well, I'm sure they hadn't lined the house up yet. They were waiting for their contact to get them a house where they could unload their drugs. That's probably the reality of the situation. I'm wondering what the evidence showed. The evidence didn't show at the suppression hearing. The evidence didn't show anything about that. Andrea Cooper couldn't identify them. They couldn't identify who they had received permission from. The district court was trying to make a decision, and they didn't have a person that they could point to that they had received permission from. Unless there are any other questions, I'll rest on my brief. Thank you. Thank you. I'll try to keep this as brief as possible. The main question I see that's been raised here is who gave permission, and I think that's absolutely a valid concern that the court has. What it appears, looking at the evidence that was elicited at the hearing itself, at the suppression hearing was that there was a deal that was struck between Andrea Cooper and Tammy Brooks was sort of acting as an intermediary for $50 plus the methamphetamines. Christian Castro arranged, in fact, for the parties to rent the subject residence. Cooper said you'd have to talk to the landlady. She says, I'm not the landlady. You'll have to talk to the landlady. Correct. Correct. That's what Cooper said. Tammy Brooks had a completely different story. There were two sides on that, and if you look at them, if you look at the two stories and you compare them side to side, Tammy Brooks' story comes out as more likely to be more reasonable. The question is whether ultimately it was a commercial transaction or, in fact, they planned on staying there longer. It's not hard to establish why they were there or how they came to be there, and I'm out of time. Thank you. Thank you. The case of United States v. Rojo and Vasquez-Vasquez is submitted. Thank you for your arguments. Thank you for coming from Idaho.
judges: Thompson, McKeown, Gould